UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATASHA FAISON-WILLIAMS,

                                    Plaintiff,

                 -against-

UNITED STATES OF AMERICA,

                                    Defendant.

Case No. 20-cv-08329 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

    Natasha Faison-Williams ("Plaintiff") brings this medical malpractice action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) (the "FTCA"), against the United States of America ("Defendant" or the "Government") based on a spine surgery that she received at the Manhattan Veterans Affairs ("VA") medical center in 2017.  ECF No. 1.  The Government has moved to exclude the expert opinions of Plaintiff's retained neurosurgeon as unreliable under Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and for summary judgment.  ECF No. 75 ("Br.").

    For the following reasons, the Government's motions are GRANTED.

## BACKGROUND

### I.   Factual Background

    Unless otherwise noted, the following facts are undisputed.

### A.   Plaintiff's Background

    Plaintiff served in the U.S. Army on active duty from October 22, 2004 through January 18, 2006, when she was honorably discharged.  ECF No. 76 ("JSOF") ¶ 4.  She enlisted in the National Guard in 2006.  *Id.* ¶ 5.  Plaintiff has seven biological children.  *Id.* ¶ 3.  Six were born

before the May 2017 surgery at issue in this action, and the seventh was born approximately one

year and three months after that surgery.  *Id.*

### B.  Plaintiff's Conversion Disorder Diagnosis

In December 2005, Plaintiff went to the Carl R. Darnall Army Medical Center in Fort

Hood, Texas ("Darnall"), with "seizure activity," including "body jerking," "bladder

incontinence," "loss of consciousness," and "paralysis."  *Id.* ¶ 98.  Plaintiff's medical records

state that she required a "walker with wheels" and dragged her right foot.  *Id.*  Plaintiff told her

providers that she had a seizure disorder that "started in 2003 with her second pregnancy."  *Id.*

The medical providers at Darnall found no physiological explanation for her seizure disorder and

paralysis.  *Id.* ¶ 99.  Plaintiff was diagnosed with "pseudoseizures" and "conversion disorder" on

December 20, 2005.  *Id.* ¶ 100.[1]

### C.  Plaintiff's Accidents

Sometime in December 2014, Plaintiff injured her back during a military training

exercise, when another soldier accidentally dropped a large bag of dirty water, known as a blivet,

on Plaintiff.  *Id.* ¶ 105.  On January 6, 2015, Plaintiff went to the emergency department of the

Wellstar Cobb Hospital in Austell, Georgia ("Wellstar"), reporting chest and upper back pain.

*Id.* ¶ 106.  She returned three days later with neck and back pain.  *Id.* ¶ 107.  She received a

magnetic resonance imaging (an "MRI") of her cervical spine (that is, her neck region), which

showed degenerative changes and mild cord flattening, *id.* ¶ 108, and an MRI of her thoracic

---

[1] The parties agree that conversion disorder is a "psychiatric condition that involves one or more symptoms of altered voluntary motor or sensory function lacking a recognized neurological or medical cause."  JSOF ¶ 102 (brackets, quotation marks, and citation omitted).  The parties further agree that unlike malingering, which occurs "when individuals present themselves as ill or impaired but have falsified symptoms with the intent to deceive," *id.* ¶ 103, conversion disorder involves "genuinely experienced symptoms that are not feigned but that have no medical cause," *id.* ¶ 104 (quotation marks, ellipsis, and citation omitted).

spine (that is, the middle section of the spine), which showed "small central disc herniation" resulting in "mild ventral cord flattening," *id.* ¶ 109.

Plaintiff returned to Wellstar on January 11, 2015, complaining of right-sided weakness and numbness, back pain, difficulty walking, and slurred speech. *Id.* ¶ 110. The doctors at Wellstar ruled out a stroke and noted malingering or conversion disorder as possible causes of her symptoms. *Id.*

Plaintiff returned to Wellstar again on May 22, 2015, complaining of chronic back pain since the blivet accident. *Id.* ¶ 111.

On September 19, 2016, the New York Army National Guard ordered Plaintiff to state active duty. *Id.* ¶ 6. On September 24, 2016, Plaintiff was in a military bus as part of that state active duty when the bus collided with another vehicle. *Id.* ¶ 7. The accident threw Plaintiff forward and down the bus stairs, after which she felt "sharp pains" in her neck and upper spine. *Id.* ¶¶ 8-9. Plaintiff did not seek medical care that day, or in the following weeks. *Id.* ¶ 10.

On November 30, 2016, Plaintiff felt a sharp pain in her back while performing an exercise called "burpees" during military training, which involves alternating push-ups and standing. *Id.* ¶ 11. She was unable to continue the training exercises. *Id.* ¶ 12.

**D. Plaintiff's Post-Accident Medical Care**

On December 2, 2016, Plaintiff went to the emergency room at St. Luke's Cornwall Hospital ("St. Luke's") complaining of mid-back pain. *Id.* ¶ 13.

On December 5, 2016, Plaintiff entered the walk-in clinic at the New York Harbor Veterans Affairs Health Care System, Brooklyn campus ("Brooklyn VA"), complaining of mid-back pain, neck pain, tingling in her fingers and feet, and a "shock-like" sensation in both feet. *Id.* ¶ 14. A computed tomography ("CT") scan of her thoracic spine noted "central disc protrusion . . . resulting in mild to moderate canal stenosis and possible mild indentation of the

ventral spinal cord." *Id.* ¶ 15.

On December 19, 2016, Plaintiff received MRIs of her cervical and thoracic spine at the Brooklyn VA. *Id.* ¶ 16. The cervical MRI radiology report noted stenosis, that is, a narrowing of the spaces inside various bones of her cervical spine in the neck region. *Id.* The thoracic MRI radiology report noted a "[c]entral disc protrusion" resulting in further stenosis and compressing her spinal cord. *Id.* (brackets in original).

On January 10, 2017, Plaintiff received a CT scan of her cervical spine at the Brooklyn VA. *Id.* ¶ 17. The radiology report noted "[m]ultilevel degenerative changes." *Id.* (brackets in original).

On January 22, 2017, Plaintiff went back to St. Luke's, complaining of a "flare up" of back pain, and told her providers that she had a history of "chronic back [and] neck pain." *Id.* ¶ 18.

## E.  February 2017 Surgery

On February 15, 2017, Plaintiff went to the Manhattan VA neurosurgery clinic, where she met with the Neurosurgery Chief, Dr. James Stone. *Id.* ¶ 19. Plaintiff's medical records indicated that she reported upper back and neck pain extending to her right arm and left leg, with associated numbing/tingling in her left arm and fingers, and that she reported intermittent headaches, gait disturbances, and incontinence of urine and stool. *Id.* Plaintiff indicated that her back pain started after the bus accident and worsened after the burpees incident. *Id.* Plaintiff did not inform Dr. Stone of her history of back pain, pseudoseizures, or conversion disorder, or of her prior treatment at Darnall and Wellstar. *Id.* Plaintiff's VA providers reviewed the radiology reports from her January 10, 2017 cervical spine CT scan, her December 19, 2016 cervical spine MRI, her December 19, 2016 thoracic spine MRI, and her December 5, 2016 thoracic spine CT scan. *Id.* ¶ 22.

4

According to the medical notes from this appointment, Dr. Stone diagnosed Plaintiff with cervical/thoracic spine stenosis and radiculo-myelopathy (pinched nerves and compressed spinal cord). *Id.* ¶ 23. Dr. Stone recommended an anterior cervical discectomy and fusion ("ACDF") at C5-C6 and C6-C7 to treat her cervical spine, and discussed the risks and benefits with Plaintiff and her husband. *Id.* He also advised Plaintiff that she might need surgery on her thoracic spine in the future. *Id.* ¶ 24.

On February 27, 2017, after signing a consent form, *id.* ¶ 25, Plaintiff underwent the ACDF at C5-C7, *id.* ¶ 26. After the surgery, Plaintiff complained of weakness and numbness in her right arm and leg, *id.* ¶ 28, but a cervical spine CT scan taken that day after the ACDF showed no evidence of complications, *id.* ¶ 29.

The notes from Plaintiff's post-operative physical examination on February 28, 2017 reflected that she had "full strength." *Id.* ¶ 30. Medical notes stated that the providers "suspect non-neurologic cause for Plaintiff's new right sided complaints as pain is non dermatomal and weakness does not correlate anatomically." *Id.* (brackets omitted).

Plaintiff was discharged after the ACDF on March 1, 2017. *Id.* ¶ 34.

## F. Recommendation for Thoracic Microdiscectomy

On March 22, 2017, Plaintiff returned to the Manhattan VA neurosurgery clinic for a post-operative visit. *Id.* ¶ 35. Plaintiff was walking with a cane. *Id.* She reported that her headaches were gone and that her left side felt better, but that her right side felt consistently weak. *Id.* The medical providers noted that Plaintiff's right-side upper extremity symptoms were of "unclear origin" but that, overall, Plaintiff was improving. *Id.* On the same day, Dr. Stone recommended a costotransversectomy/discectomy (the "Thoracic Microdiscectomy") to treat Plaintiff's disc herniation, which her providers described as "knuckling into the right side of her spinal cord." *Id.* ¶ 36 (brackets and citation omitted).

5

### G. Plaintiff's Adjustment Disorder Diagnosis

On March 24, 2017, Plaintiff saw a VA clinical psychologist. *Id.* ¶ 38. Plaintiff reported chronic neck and back pain since the bus accident. *Id.* The psychologist diagnosed Plaintiff with "Adjustment Disorder with mixed anxiety and depressed mood." *Id.*

### H. May 2017 Surgery

Plaintiff was admitted to the Manhattan VA for the Thoracic Microdiscectomy on May 1, 2017. *Id.* ¶ 39. On the same day, she signed a consent form for the surgery, which listed its known risks and side effects, including "nerve root damage leading to loss of sensation or nerve pain," "spinal cord injury leading to leg weakness or paralysis, loss of sensation[,] and loss of control of bladder and bowel," and "vascular injury with secondary bleeding or ischemia of the spinal cord." *Id.* ¶ 40 (further brackets and citation omitted). The next day, Plaintiff underwent the Thoracic Microdiscectomy, for which Dr. Stone was the attending neurosurgeon. *Id.* ¶¶ 41-42. This surgery is the subject of the alleged malpractice in this action.

Plaintiff's post-operative physical examination showed full strength in both arms, slight weakness in her right leg, and full strength in her left leg. *Id.* ¶ 43. The records further noted that Plaintiff had improved, although still slightly diminished, light touch sensation throughout the right side. *Id.* Plaintiff was discharged on May 3, 2017. *Id.* ¶ 44.

### I. Emergency Surgery for Epidural Hematoma

Plaintiff called the Manhattan VA on May 6, 2017 at 5:09 p.m., complaining of "severe pain" down her legs and an inability to walk. *Id.* ¶ 45. Plaintiff presented to St. Luke's that day at 6:50 p.m., complaining of severe upper back pain. *Id.* ¶ 46. The medical providers at St. Luke's gave her pain medicine, sent her home, and advised her to follow up with Dr. Stone. *Id.*

Two days later, Plaintiff presented to the emergency department of the Hudson Valley VA Health Care System in Castle Point, New York (the "Hudson Valley VA"). *Id.* ¶ 47. She

reported severe pain, numbness and burning in her lower extremities, the inability to walk, and loss of bladder control. *Id.* She was transferred that evening to the Manhattan VA, where she received emergency spine imaging. *Id.* ¶¶ 48-49.

An MRI of Plaintiff's thoracic spine indicated an epidural hematoma, that is, an accumulation of blood that was compressing the spinal cord. *See id.* ¶ 49. The MRI also indicated the collection of epidural fluid, resulting in the "rightward displacement of the thoracic cord." *Id.* (citation omitted). With Plaintiff's written consent, the Manhattan VA neurosurgery team performed emergency surgery and removed the epidural hematoma that day. *Id.* ¶¶ 50-51.

Medical notes and radiology reports following the surgery indicated that the surgery was generally successful and that there were no complications. *See id.* ¶¶ 51-55. On May 9, 2017, Plaintiff reported improved pain and sensation in her torso but was still having trouble moving her legs. *Id.* ¶ 55. The following day, Plaintiff reported continued improvements in pain levels, sensation, and leg strength. *Id.* ¶ 56. On May 11, 2017, Plaintiff could walk with the assistance of a rolling walker. *Id.* ¶ 57. Psychiatry medical staff evaluated Plaintiff on May 11, 2017, noting that she exhibited symptoms of post-traumatic stress disorder ("PTSD"). *Id.* ¶ 58. On May 12, 2017, Plaintiff was able to walk with a rolling walker and defecated independently with some constipation. *Id.* ¶ 59. On the following day, Plaintiff reported full leg sensation with numbness on her right flank. *Id.* ¶ 60. Plaintiff was discharged on May 14, 2017. *Id.* ¶ 61.

**J.  Plaintiff's Post-Operative Treatment and Condition Between May 2017 and April 2022**

On May 24, 2017, Plaintiff returned to the Manhattan VA neurology clinic for a post-operative appointment. *Id.* ¶ 62. Plaintiff reported that she was walking with her rolling walker, with a right foot limp, and experiencing urinary incontinence. *Id.*

Plaintiff attended three physical therapy sessions and three occupational therapy sessions at the Hudson Valley VA between June 7, 2017 and July 28, 2017.  *Id.* ¶ 63.  During her physical therapy sessions, she ambulated without a rolling walker, cane, or crutches.  *Id.* ¶ 64.  After poor attendance at appointments, she was discharged from physical and occupational therapy on July 28, 2017.  *Id.* ¶ 65.

On August 25, 2017, Plaintiff presented to the Orange Regional Medical Center ("ORMC") with complaints of worsening back pain, right-sided pain and weakness, urge incontinence, and an inability to walk.  *Id.* ¶ 66.  Plaintiff was transferred to the Manhattan VA for further evaluation.  Radiographic imaging of Plaintiff's spine dated August 25, 2017, did "not identify pathology that corresponds with patient's complaint/exam."  *Id.*  Several providers noted that Plaintiff's symptoms had an "unclear etiology" and did not have a "primary neurosurgical etiology."  *Id.* ¶ 67.

On October 12, 2017, Plaintiff presented to the Hudson Valley VA for a neurology appointment, reporting urinary incontinence and decreased sensation and strength in her right leg since August 2017.  *Id.* ¶ 69.  The neurologist who examined Plaintiff noted "some inconsistency" between Plaintiff's reported symptoms and her neurological exam, as well as "decreased effort."  *Id.*  The neurologist also noted that during his examination of Plaintiff, she "ambulated with crutches and dragged right leg however once leaving and walking down the hall she was lifting her foot and not dragging it.  Therefore, I feel there is some exaggeration of deficits."  *Id.* (brackets omitted).

On February 11, 2018, Plaintiff presented to ORMC, where she reported that she had slipped and fallen twice on her icy driveway and hit her head on the ground.  *Id.* ¶ 70.  ORMC imaged, treated, and discharged Plaintiff that day.  *Id.*  The next day, Plaintiff presented to the

Hudson Valley VA and reported that "this morning she started having increased difficulty walking" and had numbness and tingling down the right side of her leg. *Id.* ¶ 71. She was transferred to the Vassar Brothers Medical Center in Poughkeepsie, New York, where she reported that she felt better, and discharged. *Id.* Medical records from this visit indicate "no findings to correlate with [Plaintiff's] profound deficits." *Id.*

Between March 2018 and July 2020, Plaintiff attended several examinations and appointments, during which she was noted to have no problems walking. On March 26, 2018, Plaintiff was noted as having a normal gait during a physical examination at the Hudson Valley VA. *Id.* ¶ 72. On September 24, 2018, during a pain-management appointment at the Hudson Valley VA, Plaintiff reported that she no longer used crutches to walk. *Id.* ¶ 73. On February 13, 2019, Plaintiff attended an appointment at the Hudson Valley VA, "ambulating without any [assistive devices]." *Id.* ¶ 74 (citation omitted). Plaintiff also attended a clinical appointment on March 1, 2019, walking without any assistive devices. *Id.* ¶ 75. On April 12, 2019, she told her physical therapists that she could walk 2.5 miles in 33 minutes; on May 3, 2019, she told them that she could bench press 350 pounds with her lower extremities. *Id.* ¶ 78. On July 24, 2020, Plaintiff was reported to have walked into an urgent-care appointment at the Hudson Valley VA with a "steady gait." *Id.* ¶ 79.

On October 14, 2020, Plaintiff presented to ORMC, reporting increased neck and back pain, numbness in her fingers and toes, and urinary incontinence. *Id.* ¶ 80. Plaintiff could not walk independently, but was able to walk three days earlier. *Id.* She said that she was experiencing new left-sided weakness and numbness. *Id.* An MRI of Plaintiff's thoracic spine found no disc herniations or spinal stenosis; an MRI of her cervical spine showed spinal stenosis.

*Id.* ¶ 81.  On October 20, 2020, Plaintiff's providers at ORMC considered a diagnosis of conversion disorder.  *Id.* ¶ 82.

Plaintiff was admitted to the Nyack Ridge Rehabilitation & Nursing Center ("Nyack"), a subacute nursing facility, for rehabilitation between October 29, 2018 and November 18, 2018. *Id.* ¶ 83.  The Nyack supervisor advised that, upon discharge, Plaintiff was "ambulatory" and would be able to function well as long as her pain was controlled.  *Id.* ¶ 84.

According to a note from a November 23, 2020 telephone appointment, Plaintiff could take small steps with crutches.  *Id.* ¶ 85.  However, by February 25, 2021, Plaintiff reported to her VA medical providers that she was unable to walk or care for herself.  *Id.* ¶ 86.  She also testified at her deposition that she had been wheelchair-bound since the end of 2020.  *Id.* ¶ 87.

In September 2021, Plaintiff sought treatment at a VA medical center in Atlanta, Georgia ("Atlanta VA") for neck and spine pain, leg numbness, and tremors.  *Id.* ¶ 88.  She received an MRI, which her doctor noted "do[es] not fully explain [Plaintiff's] widespread [symptoms]."  *Id.*

On April 30, 2022, Plaintiff was knocked from her wheelchair onto the ground during a domestic dispute.  *Id.* ¶ 89.  She presented to the emergency department at Tanner Medical Center ("Tanner") in Carollton, Georgia.  *Id.*  She complained of back and neck pain, and received imaging of her spine, which revealed degenerative changes in her cervical spine but was otherwise unremarkable.  *Id.*

### K.  July 2022 Surgery

On May 21, 2022, Plaintiff presented to the Atlanta VA, complaining of increased pressure and pain in her spine and tingling in both hands.  *Id.* ¶ 90.

On May 23, 2022, Plaintiff presented to Tanner and reported a grinding and popping sensation in her neck and increased numbness.  *Id.* ¶ 91.

Plaintiff received a cervical spine MRI on May 24, 2022, which showed cervical spondylosis, disc herniations, and "degenerative changes." *Id.* ¶ 92. An MRI of her thoracic spine from the same day also showed "stable disc disease." *Id.* (brackets and citation omitted).

On June 10, 2022, Plaintiff was examined at Tanner and underwent a CT cervical myelogram. *Id.* ¶ 93. On July 20, 2022, Plaintiff underwent another ACDF at Tanner, this time of the C3-C4 and C4-C5 levels, performed by Dr. Brad Prybis at Tanner. *Id.* ¶ 94. Three days later, Plaintiff reported that her chronic arm pain and tingling had improved. *Id.* ¶ 96.

Plaintiff received a thoracic spine MRI on October 27, 2022, which reflected "multilevel degenerative changes with neural foraminal narrowing." *Id.* ¶ 97 (brackets omitted).

## II.    Procedural History

On November 12, 2018, Plaintiff submitted an SF-95 administrative claim to the Department of Veterans Affairs, alleging that Dr. Stone deviated from the applicable standard of care when performing the May 2, 2017 Thoracic Microdiscectomy. *Id.* ¶ 112. Proceeding under the FTCA, Plaintiff commenced this action on October 6, 2020, ECF No. 1, and filed the operative complaint on October 12, 2020, ECF No. 2. Plaintiff originally asserted two malpractice claims, alleging that Stone committed malpractice first by scheduling and supervising the Thoracic Microdiscectomy, and second, by performing the Thoracic Microdiscectomy in a manner that fell below the standards of good and acceptable medical care. *Id.* ¶¶ 25-33. Plaintiff voluntarily dismissed the latter claim on August 26, 2021. ECF No. 34. Thus, the only remaining claim is Plaintiff's contention that it was malpractice for Stone to schedule and supervise the May 2, 2017 Thoracic Microdiscectomy.

The Government filed the instant motions on June 27, 2023. Br. Plaintiff opposed the motions on July 20, 2023. ECF No. 82 ("Opp."). The Government replied in further support of

its motions on July 26, 2023.  ECF No 84 ("Reply").  The Court held a hearing on the motions on March 13, 2024.  ECF No. 89.

### III.    Expert Testimony

#### A. Plaintiff's Expert

Plaintiff retained a neurosurgeon, Dr. Martin Zonenshayn, who submitted three expert affirmations evaluating Dr. Stone's treatment of Plaintiff.  *See* JSOF ¶¶ 116-118; ECF Nos. 80-20 (the "Feb. 7, 2022 Rep."), 80-21 (the "May 24, 2022 Rep."), 81-1 (the "Mar. 9, 2023 Rep."). Zonenshayn opined that Stone correctly assessed Plaintiff's cervical spine conditions and did not depart from the standard of care in scheduling and performing the February 27, 2017 ACDF. JSOF ¶ 117.  However, he opined that Stone deviated from the standard of care in recommending and scheduling the May 2, 2017 Thoracic Microdiscectomy.  *Id.* ¶ 118.

Zonenshayn opined that it was malpractice for Stone to proceed with that surgery for several reasons: Plaintiff's disc herniation only "abutted" but did not compress her spinal cord; the surgery was performed too soon after the February 27, 2017 ACDF; and Stone should have ruled out psychiatric or non-neurological causes for Plaintiff's symptoms.  *Id.* ¶¶ 119-122.  He further opined that the surgery caused Plaintiff to develop an epidural hematoma, which injured Plaintiff and caused her pain.  *Id.* ¶ 123.

As to causation, Zonenshayn's first expert report states conclusorily that "[h]ad thoracic spine surgery not been performed, the Plaintiff would have never experienced the related postoperative complication which resulted in her marked neurologic deficits and dysfunction." Feb. 7, 2022 Rep. ¶ 20.  At his first deposition, Zonenshayn testified that although he was "offering an expert opinion in this case regarding the cause of . . . Ms. Faison-Williams'[s] neurological deficits [and] dysfunction as she presented to the VA on May 8, 2017, and the lower extremity complaints . . . enumerated in terms of pain, numbness, weakness, gait disturbances,

[and] bowel and bladder symptoms," his basis for this opinion was *not* contained in his report. ECF No. 81-4 at 138:13-139:15.  He further agreed that his report "does not explain the basis for [his] opinions regarding the cause of . . . Ms. Faison-Williams'[s] symptomology," because he "didn't recognize that it needs to be in the report."  *Id.* at 139:21-140:17.

Zonenshayn then submitted a second expert report to "clarify" his causation opinion as stated in his first expert report.  May 24, 2022 Rep. ¶¶ 6-7.  In his second expert report, Zonenshayn opined that:

> [T]he postoperative complication I am referring to is the epidural hematoma which developed in the Plaintiff's thoracic spine after her May 2, 2017 surgery.  While this hematoma was correctly evacuated on May 8, 2017, significant damage to the spinal cord had already occurred.  In fact, multiple MRI scans of the thoracic spine subsequent to May 8, 2017 [that is, the date that the epidural hematoma was evacuated] . . . reveal visible anatomic damage within the spinal cord at the T5-6 level.  The defense expert's[] questioning of Ms. Faison-Williams['s] sincerity, possible malingering, and conversion disorder simply cannot result in visible anatomic spinal cord damage that was not present prior to the development of the post-operative hematoma.

*Id.* ¶ 7.

However, during his depositions, Zonenshayn testified that he "highly doubt[ed]" that the Thoracic Microdiscectomy was the "only cause" of Plaintiff's bowel and bladder issues, and that those could have instead been caused by Plaintiff's childbirths.  JSOF ¶¶ 125-126.  He also testified that he had concerns that Plaintiff has engaged in malingering, and that some of her symptoms may be psychological.  *Id.* ¶¶ 131-132.  Indeed, Zonenshayn testified that "there's definitely . . . a psychological overlay here especially in somebody with her mental health history and PTSD."  ECF No. 81-6 ("Zonenshayn Second Dep.") at 86:14-17.  He also testified that cervical spinal cord damage could have caused Plaintiff's lower extremity symptoms, gait imbalance, weakness in the legs, and urinary and bowel incontinence, and that a spinal cord

injury at T5-T6 can also cause weakness in the legs.  JSOF ¶ 136.  Additionally, Zonenshayn testified that it would be "unusual" for a thoracic spinal cord injury to progress to paraplegia, as Plaintiff alleges happened to her.  *Id.* ¶ 133.

### B.  The Government's Experts

#### 1.  Dr. Fischer

The Government retained Dr. Charla Fischer, an orthopedic surgeon specializing in spine surgery.  *Id.* ¶ 156.  Fischer opined that the Government did not depart from the standard of care with respect to its treatment of Plaintiff's thoracic spine conditions.  *Id.* ¶ 164.  She concluded that Plaintiff's Government providers correctly diagnosed her with thoracic myelopathy, that the timeframe between Plaintiff's surgeries was reasonable and appropriate, and that the surgery was appropriate regardless of Plaintiff's psychiatric history.  *Id.* ¶¶ 165-168.  Fischer also opined that the Thoracic Microdiscectomy did not cause Plaintiff's alleged injuries, and that her symptoms of bladder and bowel incontinence, muscle weakness, decreased sensation, and back pain all preexisted the Thoracic Microdiscectomy.  *Id.* ¶¶171-175.  She further opined that the symptoms that Plaintiff attributes to her epidural hematoma were related to a genetically determined degenerative condition, not her thoracic spine.  *Id.* ¶ 177.  Finally, Fischer opined that Plaintiff's history of conversion disorder and malingering raised questions about Plaintiff's "sincerity and ability to be an accurate historian" of her medical conditions.  *Id.* ¶ 178.

#### 2.  Dr. Medalia

The Government also retained Dr. Alice Medalia, a clinical psychologist who specializes in medical psychology.  *Id.* ¶ 180.  Medalia opined that to the extent a medical cause cannot be determined for Plaintiff's symptoms, a diagnosis of "Functional Neurological Symptom Disorder" (or conversion disorder) is appropriate.  *Id.* ¶ 181.  She also opined that Plaintiff had presented with neurological symptoms without a traceable medical etiology since 2005.  *Id.*

¶ 182.  Medalia remarked that it is not unusual for someone with Plaintiff's history of childhood

and sexual trauma to present with non-neurologically based motor and sensory symptoms.  *Id.*

¶ 183.  Medalia also relayed that Plaintiff has been diagnosed with Trauma and Stress Disorder

as well as Adjustment Disorder with Depressed Mood, and that she has a history of spouse or

partner violence and physical and sexual abuse, including during childhood.  *Id.* ¶¶ 184-186.

## LEGAL STANDARD

### A.  Rule 702 and *Daubert*

Under Rule 702:

> A witness who is qualified as an expert . . . may testify in the form
> of an opinion or otherwise if the proponent demonstrates to the
> court that it is more likely than not that: (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is
> the product of reliable principles and methods; and (d) the expert's
> opinion reflects a reliable application of the principles and methods
> to the facts of the case.

"The Second Circuit has distilled Rule 702's requirements into three broad criteria:

(1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact."  *In re*

*Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quotation marks and

citation omitted).  District courts serve as "gatekeep[ers]," responsible for "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert*, 509 U.S. at 597.  They have "broad discretion in the matter of the admission or

exclusion of expert evidence."  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.

1996) (per curiam) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)); *accord Bic Corp.*

*v. Far E. Source Corp.*, 23 F. App'x 36, 38 (2d Cir. 2001) (summary order) ("The trial court's

discretion is especially broad with respect to the admission or exclusion of expert evidence.").

To testify as an expert under Rule 702, a witness must be "qualified as an expert by knowledge,

skill, experience, training, or education."  Fed. R. Evid. 702.  "Any of the five forms of

qualifications will satisfy the rule," and a court makes this determination by considering "the

totality of the witness's background."  *In re Aluminum Warehousing*, 336 F.R.D. at 27 (brackets

and citations omitted).

### B.  Summary Judgment

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to

summary judgment if, on any claim or defense, that party demonstrates from the admissible

evidence and pleadings "that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute over an

issue of material fact is one in which "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the

initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party

who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can

point to an absence of evidence to support an essential element of the nonmoving party's

claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)

(citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the

light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*,

373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought," *Est. of Gustafson ex*

*rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of*

*Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat a motion for summary judgment,

the non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at

252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "does not impose an

obligation on a district court to perform an independent review of the record to find proof of a

factual dispute."  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  It is

instead the parties' responsibility to "point out" contested facts for the Court, and "to clarify the

elements of the substantive law which remain at issue because they turn on contested facts."

*Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).

## DISCUSSION

Plaintiff brings this medical malpractice action against the Government, asserting that it

was malpractice for Dr. Stone to schedule and supervise the May 2, 2017 Thoracic

Microdiscectomy.  JSOF ¶ 113.  She no longer alleges that the Thoracic Microdiscectomy was

negligently performed, or that any other aspect of her care from the Government was

malpractice.  *Id.* ¶¶ 113-115.

In this case, reliable expert testimony as to both causation and liability is critical.  "To

establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the

defendant breached the standard of care in the community, and (2) that the breach proximately

caused the plaintiff's injuries."  *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994); *accord*

*Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 61 (2d Cir. 2023).[2]  "[E]xcept as to matters within the

ordinary experience and knowledge of laymen, expert medical opinion evidence is required to

make out" these elements.  *Milano ex rel. Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995)

---

[2] New York law applies to this action.  Under the FTCA, to determine whether a tort has
occurred, a federal court applies the substantive law of the state where the alleged tort occurred.
*See* 28 U.S.C. § 1346(b)(1); *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000).

(ellipsis and citation omitted) (applying New York law).  Spine surgery "cannot reasonably be thought . . . [to be] within the common knowledge of ordinary lay persons."  *Sitts v. United States*, 811 F.2d 736, 741 (2d Cir. 1987).  Therefore, Plaintiff is required to present reliable expert testimony establishing both causation and liability.

The Court will first address the *Daubert* motion brought by the Government and then the motion for summary judgment.

## I.    *Daubert* Motion

The Government asks the Court to exclude Zonenshayn's expert testimony because: (1) his opinions as to causation are unreliable because he failed to rule out obvious alternative causes; and (2) his opinions as to liability are unreliable because he did not employ a reliable methodology in reaching his conclusions.  Br. at 21.

Because this is a FTCA case solely against the Government, a trial in this case would be a bench trial.  *See* 28 U.S.C. § 2402 (no right to jury trial in FTCA cases).  The Court acknowledges that courts are generally more willing to admit expert testimony "in the context of a bench trial, where there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis."  *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013) (quotation marks and citation omitted).  Nevertheless, even in such cases, the Court must fulfill its "'gatekeeping' obligation that includes the 'task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Conde v. United States*, No. 19-cv-08506 (NRB), 2021 WL 3604701, at *12 (S.D.N.Y. Aug. 13, 2021) (quoting *Daubert*, 509 U.S. at 597); *see id.* at *12-13 (excluding expert testimony in FTCA case).

**A. Causation**

The Government argues that Zonenshayn's opinions on causation are unreliable because he failed to rule out three obvious possible causes of Plaintiff's alleged injuries: (1) Plaintiff's cervical spine disease, Br. at 24-27; (2) her preexisting conditions, *id.* at 27-29; and (3) malingering or conversion disorder, *id.* at 22-24.

In opposition, Plaintiff states, without citation, that Zonenshayn "adequately ruled out alternative causes." Opp. at 16. Plaintiff directs the Court to the steps Zonenshayn took in analyzing causation, which, according to Plaintiff, "consisted of: reviewing all imaging provided to him to determine whether diagnostic evidence reveals damage to Plaintiff's spine and at which anatomical level; correlating any signs or symptoms identified in neurological exams and in other medical records that are consistent with the diagnostic evidence; and considering other information that in his experience and medical knowledge may be relevant." *Id.*

"When a medical expert gives an opinion on causation, rather than merely a diagnosis, the expert typically performs additional analyses or tests, such as a 'differential diagnosis' test, to isolate other potential causes of the [symptoms]." *El Ansari v. Graham*, No. 17-cv-03963 (VEC), 2019 WL 3526714, at *6 (S.D.N.Y. Aug. 2, 2019) (further quotation marks and citation omitted). "A factor that courts have considered in *Daubert* analyses is whether an expert has accounted adequately for obvious alternative explanations. This is appropriate because any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect." *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005). Expert testimony that discusses "only the evidence that [he or she] believe[s] would advance the plaintiffs' position" does not "reflect 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 426 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). If an expert fails to "demonstrate that he has adequately accounted

for obvious alternative explanations," his testimony is not reliable.  *U.S. Info. Sys., Inc. v. International Brotherhood of Electrical Workers Local Union Number 3*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004).  "An expert is not required, however, to categorically exclude each and every possible alternative cause."  *Id.*  But failure to "conduct[] a *meaningful* differential diagnosis ruling out other possible contributing factors . . . is reason alone to exclude" an expert's medical opinion "with respect to causation."  *Conde*, 2021 WL 3604701, at *13 (emphasis added; quotation marks and citation omitted).

There are several exceptions to the need for a differential diagnosis to prove causation; none apply here.  First, "[a] patient's treating physician generally does not need to perform a differential analysis in order to reach a conclusion on causation," *El Ansari*, 2019 WL 3526714, at *7, because the physician often forms an opinion as to causation in order to treat the patient, *see Santoro v. Signature Constr., Inc.*, No. 00-cv-04595 (FM), 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002).  Second, if a causal connection between an injury and its source would be obvious to a layperson, a differential diagnosis is unnecessary.  *See Roman v. Sprint Nextel Corp.*, No. 12-cv-00276 (VEC), 2014 WL 5026093, at *11 (S.D.N.Y. Sept. 29, 2014). Finally, in some cases, courts have admitted testimony from medical experts regarding causation without a differential diagnosis where the court finds that there are otherwise sufficient indicia of reliability, such as when the expert relies on medical records, literature, and interviews or examinations of the plaintiff.  *See, e.g., O'Loughlin v. USTA Player Dev. Inc.*, No. 14-cv-02194 (VB), 2016 WL 5416513, at *4-6 (S.D.N.Y. Sept. 28, 2016) (admitting expert testimony of medical professional who did not perform a differential diagnosis but instead reviewed medical records, medical literature, interviewed the patient, and the applicable law required the alleged cause to be only a "substantial factor in bringing about the result" (emphasis omitted)); *Figueroa*

*v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003) (differential diagnosis was not necessary where expert reviewed medical records, depositions, peer-reviewed scientific literature, and there was a strong temporal connection between the incident and the injury). Zonenshayn was not Plaintiff's treating physician, the causal connection is not obvious, and he did not do an extensive analysis of medical records and relevant literature, nor conduct an examination of the Plaintiff.

The Court finds that Zonenshayn failed to rule out obvious alternative causes of Plaintiff's symptoms.  Perhaps most prominently, Zonenshayn failed to rule out cervical spine disease as an alternative cause for Plaintiff's symptoms. Br. at 24-27.  Although Plaintiff argues that "Zonenshayn's methodology . . . was used to rule out the cervical spine as a possible cause of Plaintiff's continuing incontinence, lower body weakness, and gait disturbance," Zonenshayn's testimony supports the opposite conclusion.  Opp. at 17.  For example, Zonenshayn testified in his second deposition that issues with "cervical myelopathy can cause lower extremity symptoms," including "weakness in the legs," "upper extremity symptoms," "urinary incontinence," and "bowel incontinence," and that in contrast, "it's uncommon" for "issues with the thoracic spine [to] cause right foot drop."  Zonenshayn Second Dep. at 91:17-93:12 (further brackets omitted).  Thus, Zonenshayn has not ruled out the obvious alternative cause of cervical spine disease for Plaintiff's medical issues.

Zonenshayn also failed to rule out other preexisting conditions as possible causes of Plaintiff's symptoms.  To begin with, the parties agree that Plaintiff's neck and back pain preexisted the Thoracic Microdiscectomy.  JSOF ¶¶ 5-8.  Zonenshayn also opined that Plaintiff has a thoracic disc bulge, which is a "degenerative condition" (that is, "something that occurs over time").  Zonenshayn Second Dep. at 41:15, 42:4-5.  And as to Plaintiff's urinary and bowel

incontinence, Zonenshayn testified that he "highly doubt[ed]" that the Plaintiff's thoracic spine was the only cause of these symptoms. *Id.* at 78:5. He could not provide an approximate "percent or . . . portion of the cause of Ms. Faison-Williams'[s] bladder and bowel issues" attributable to her damaged thoracic spine, rather than to her multiple childbirths. *Id.* at 78:6-11. Plaintiff does not even argue in her opposition brief that Zonenshayn ruled out other preexisting conditions as alternative causes for her symptoms. *See generally* Opp. The Court therefore independently reviewed Zonenshayn's expert testimony, and does not find any indication that he ruled out preexisting conditions as obvious alternative causes of Plaintiff's symptoms. Zonenshayn's failure to try to rule out cervical spine disease or other preexisting conditions as the cause of Plaintiff's medical issues renders his expert testimony unreliable. *See DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 239 (S.D.N.Y. 2010) (excluding as unreliable testimony of plaintiff's medical expert that "fail[ed] to offer an explanation for why the proffered alternative cause was not the sole cause" of plaintiff' injuries (citation omitted)); *Conde*, 2021 WL 3604701, at *11-13 (excluding as unreliable a medical expert's testimony on causation where the expert "could not definitively rule out the possibility that the injuries in question were caused by a degenerative condition"); *In re Fosamax Prods. Liab. Litig.*, 688 F. Supp. 2d 259, 268 (S.D.N.Y. 2009) ("If an expert utterly fails to consider alternative causes or fails to offer an explanation for *why* the proffered alternative cause was not the *sole* cause, a district court is justified in excluding the expert's testimony." (emphasis added; brackets and citation omitted)).

Finally, Zonenshayn failed to rule out psychological causes – namely, malingering or conversion disorder – for Plaintiff's alleged symptoms. Psychological issues are not always an obvious alternative cause of physical symptoms reported by a plaintiff. However, in this case, psychological problems were an obvious alternative cause of Plaintiff's medical issues.

Zonenshayn opined in his first expert report that Stone should not have recommended and proceeded with the Thoracic Microdiscectomy in part because "Plaintiff's personality, psychological issues, and trauma history impacted how she experienced her pain and functional problems."  Feb. 7, 2022 Rep. ¶ 8.  He further opined that "thoracic spine surgery should not have been attempted as a treatment for psychological symptoms."  *Id.*  Thus, Zonenshayn seemed to recognize – without addressing – Plaintiff's psychiatric history as an obvious alternative cause of her symptoms. [3]

In his second report, Zonenshayn opined that "[t]he defense expert's[] questioning of Ms. Faison-Williams['s] sincerity, possible malingering, and conversion disorder simply cannot result in visible spinal cord damage that was not present prior [to] the development of the post-operative hematoma."  May 24, 2022 Rep. ¶ 7.  Zonenshayn continues: "[i]t is well known and accepted that thoracic spinal cord injury . . . can and frequently does result in bowel and bladder dysfunction, lower extremity weakness, numbness and pain.  It is clear from the medical record that the plaintiff suffered neurologic injuries, such as right foot drop and incontinence."  *Id.* Although Zonenshayn briefly stated that "malingering[] and conversion disorder" were not possible alternative causes of the actual "visible spinal cord damage" in his second report, May 24, 2022 Rep. ¶ 7, he acknowledged that Plaintiff's reported *symptoms* "may be psychological," Zonenshayn Second Dep. at 86:10-11; *see id.* at 86:14-15 (noting that "there's definitely . . . a psychological overlay here").  Zonenshayn also opined in his first expert report that a "sizable

---

[3] In her opposition, Plaintiff failed to make any argument regarding whether Zonenshayn ruled out Plaintiff's known psychological problems as the possible cause of her later symptoms.  *See generally* Opp.  The Government argued in its reply that Plaintiff had waived the issue of whether "conversion disorder and not medical malpractice caused Plaintiff's symptoms."  Reply at 4.  Despite Plaintiff's failure to make this argument, the Court considered the entirety of Zonenshayn's expert testimony in analyzing the instant motions.

majority of adults have evidence of spinal 'abnormality' on MR imaging, yet remain asymptomatic." Feb. 7, 2022 Rep. ¶ 15. Zonenshayn fails to explain why scans showing spinal cord abnormality after Plaintiff's emergency hematoma surgery necessarily means that Plaintiff's later symptoms were caused by the Thoracic Microdiscectomy, rather than her known psychological issues.

Further although Plaintiff argues that Zonenshayn identified damage to Plaintiff's thoracic spine as the "most likely cause" of her neurological problems, Opp. at 17, the sources cited do not support that proposition. Even in Zonenshayn's second report, which was submitted to "clarify" his opinions as to causation, Zonenshayn does not opine that damage to Plaintiff's thoracic spine from medical malpractice is the "most likely cause" of Plaintiff's symptoms. *See generally* May 24, 2022 Rep. Rather, he opines that "thoracic spinal cord injury . . . *can* and frequently does result in" the symptoms reported by Plaintiff. *Id.* ¶ 7 (emphasis added). That spinal cord injury "can" result in certain symptoms, and that the Plaintiff later reported such symptoms, is not reliable expert testimony as to actual causation in this medical malpractice case where other potential causes abound. *Cf. Adeghe v. Janssen Pharms., Inc.*, No. 16-cv-02235 (LGS), 2017 WL 3741310, at *4 (S.D.N.Y. Aug. 30, 2017) (denying motion to preclude plaintiff's medical expert on causation where expert offered testimony that product at issue was the "most likely cause" of the plaintiff's symptoms "from a list of possible causes" after performing a differential diagnosis).

The *Conde* court analyzed a similar question. There, the plaintiff cited to the report of his expert who had concluded that plaintiff's injuries "occurred as a result of the [subject] motor vehicle accident" and argued that "if [plaintiff] did not have prior neck and back problems, and now has severe neck and back problems after the collision, causation is only logical." 2021 WL

3604701, at *9 (brackets omitted).  The court concluded that the "plaintiff's conclusory arguments and evidence are insufficient to raise a genuine dispute of material fact regarding causation," including in part because the expert "failed to provide any sort of analysis with respect to causation."  *Id.* at *10.  Here, too, Plaintiff's expert simply states that Plaintiff suffered a hematoma, that such a hematoma "can" result in certain symptoms, and that the plaintiff later reported such symptoms.  This is not reliable testimony as to causation given all of the potential contributing factors to her symptoms.

The expert testimony at hand also differs from the expert testimony as to causation that the court found sufficiently reliable in *In re Fosamax Products Liability Litigation*.  There, the plaintiff's medical expert opined that the product at issue was the cause of plaintiff's subsequent medical condition, but did not just stop there.  688 F. Supp. 2d at 262-63.  The expert offered specific reasons for ruling out other possible causes of the plaintiff's injury, including the inefficacy of treatments that would have addressed those possible causes.  *Id.*  The court found this methodology sufficiently reliable to admit the expert's testimony under Rule 702 and *Daubert*.  *Id.* at 267-68.  The court reasoned that while the "expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified."  *Id.* at 268 (citation omitted).  The court noted that it could exclude an expert's testimony if he or she "utterly fails to consider alternative causes or fails to offer an explanation for *why* the proffered cause was not the *sole* cause."  *Id.* (emphases added; citation omitted).  Here, Zonenshayn failed to explain why the obvious, alternative causes are not the sole cause of Plaintiff's medical issues.

Given these deficiencies, Zonenshayn's opinion is not reliable.  Plaintiff had multiple opportunities for her expert to provide sound reasoning as to causation, and Zonenshayn accordingly submitted three expert affirmations, including one specifically designed to "clarify" his opinions as to causation.  *See* Feb. 7, 2022 Rep.; May 24, 2022 Rep. ("clarify[ing]" his "causation" opinion); Mar. 9, 2023 Rep.  Despite these supplements, Zonenshayn's opinion still fails to exclude potential obvious, alternative causes of Plaintiff's symptoms and is therefore unreliable.

### B. Liability

The Government also argues that Zonenshayn's expert testimony on liability is unreliable and should be excluded because his opinion that Stone breached the standard of care is not based on a reliable methodology.  Br. at 29-31.  The Court does not reach this argument, having already held that Zonenshayn's expert testimony on causation is unreliable and must be excluded.

## II.    Summary Judgment

Plaintiff "concedes that if the [Government's] *Daubert* motion is granted summary judgment must necessarily follow."  Opp. at 18.  Thus, because the Court has excluded Zonenshayn's expert testimony, summary judgment is GRANTED in favor of the Government.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Government's motion to exclude expert testimony from Plaintiff's expert.  The Court further GRANTS the Government's motion

for summary judgment.  The Clerk of Court is respectfully directed to close the motion pending

at ECF No. 74 and to CLOSE the case.

Dated: March 20, 2024
　　　New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge